**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| MEGAN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-CV-587-JED-PJC |
| v. | ) | |
| | ) | |
| STANLEY GLANZ, in his individual | ) | |
| capacity; VIC REGALADO, in his official | ) | |
| capacity as Sheriff of Tulsa County, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

### I.    Background

This is an employment discrimination action in which plaintiff alleges violations of Title

VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983, on the basis of race and sex

discrimination in pay and alleged retaliation.  The Court previously dismissed with prejudice, as

time-barred, "plaintiff's Title VII claims that [were] based on allegations relating to a failure to

promote her in 2007, 2009 and through June 2010. . .," (Doc. 23 at 9) and granted defendants'

motion to strike portions of plaintiff's Second Amended Complaint (SAC) that were unrelated to

plaintiff's remaining claims. The defendants now move for summary judgment (Doc. 56).

Plaintiff is an African American female who began work as a detention officer (DO) at

the Tulsa County Jail (Jail) in 2001.  At the time, the Jail was operated by the Corrections

Corporation of America (CCA), and CCA was plaintiff's employer.  After the Tulsa County

Sheriff's Office (TCSO) took over Jail operations in July 2005, plaintiff then became an

employee of TCSO, where she continued in her job as a Jail DO.  In June 2009, plaintiff passed

the required exam for promotion to non-certified corporal and sergeant, and she was promoted to

corporal on September 1, 2009.  Before she was promoted, plaintiff was a DO, at grade B04, step

G of the TCSO Salary Scale, which resulted in a monthly salary of $2,471.  (*See* Doc. 61-9).

After she was promoted, plaintiff was a corporal, at grade B06, and her pay was set at step A, which increased her salary to $3,218 monthly. (*Id.*).  The crux of plaintiff's pay discrimination claim is that the 30% pay raise she received was discriminatory because (1) pursuant to TCSO's written Salary Program - Policy No. 3-16 (Doc. 61-4), she should have been moved up to the corporal grade at step F, one step down from the step she occupied while at the DO grade,[1] and (2) Caucasian and/or male employees were paid more than she was paid for similar jobs.

For her retaliation claim, plaintiff asserts that, after she submitted her charge of discrimination to the EEOC (on August 17, 2011) and filed her lawsuit (on September 17, 2012), she suffered adverse employment actions.  According to plaintiff, those actions included being "essentially stripped" of supervisory duties, being watched or followed at work and then accused of not doing her job, hearing the Undersheriff refer to lawsuits against the TCSO as "bullshit lawsuits," and suffering shift changes in October 2013.  (Doc. 61 at 15, ¶ 44; *id.* at 22-23).

## II.   Summary Judgment Standards

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby,*

---

[1]     There is a flaw in the plaintiff's own argument regarding the manner in which she claims the pay scale should have been applied to her.  Her contention that she should have been paid at step F of the corporal grade (B06) – which is two grades above and one step below the DO position from which she was promoted (B04/G) – is itself inconsistent with the written policy.  The policy states that "[u]pon promotion, an employee will be moved back one step *for each upward grade level of promotion*, except for promotion to deputy III, in which case the employee will be moved up one grade but back two steps.  Example: If an employee is promoted from deputy II to sergeant, the employee might move from grade B05 to B07, but from step F to step D."  (Doc. 61-4 at 2) (emphasis added).  It would appear that application of the written policy would result in plaintiff moving from grade B04, step G to grade B06, step E, which is up two grades, and back one step for *each grade* of promotion.  (*See id.*).  Grade B06, step E paid $3,911 monthly, not $4,107, as plaintiff has argued.  (*See* Doc. 61-7).

2

*Inc.*, 477 U.S. 242, 250 (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor.  *Id.* at 255.  The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment, while ignoring evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-68 (2014) (per curiam).

These general summary judgment standards apply to plaintiff's employment claims.  *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).  Thus, the Court must view all facts in the light most favorable to the plaintiff as the non-moving party and will "draw all reasonable inferences" in her favor.  *Id.*; *see Anderson*, 477 U.S. at 255.

### III.    Analysis

#### A.      Title VII Framework

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff proves a Title VII violation "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  In the absence of direct evidence of discriminatory intent, the Court must analyze the evidence under *McDonnell Douglas.  Riser v. QEP Energy*, 776 F.3d 1191, 1199-1200 (10th Cir. 2015).

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination, which requires that the plaintiff demonstrate that she (1) is a member of a protected class, (2) suffered an adverse employment action, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011). The plaintiff's burden at the prima facie stage requires only a "small amount of proof necessary to create an inference" of discrimination or retaliation, by a preponderance of the evidence, and the burden is "not onerous." *Smothers v. Solvay Chem., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

To establish a prima face case of pay discrimination under Title VII, plaintiff must show that she occupies a job similar to that of higher paid employees who do not share her protected status (here, race or sex). *See Riser*, 776 F.3d at 1200; *Johnson v. Weld Cty., Colo.*, 594 F.3d 1201, 1215 (10th Cir. 2010). If the plaintiff meets the prima facie burden, then the employer must articulate a legitimate, non-discriminatory reason for the employment action, which is a burden of production, not one of persuasion. *Smothers*, 740 F.3d at 539 (citing *Horizon/CMS Healthcare*, 220 F.3d at 1191). Assuming the employer meets that burden, then the plaintiff may defeat summary judgment only by showing that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Thus, if "a plaintiff demonstrates that an employer's proffered reasons are 'unworthy of credence,' a jury may 'infer the ultimate fact of discrimination' or retaliation." *Smothers*, 740 F.3d at 546 (quoting *Swackhammer v. Spring/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).  However, "[m]ere conjecture that the employer's reason is pretext . . . will not defeat a motion for summary judgment." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997).

### B.    Pay Discrimination Based on Race and Sex (First and Fourth Claims)

Most of the plaintiff's evidence and arguments relate only to her *failure to promote* claims, which the Court previously dismissed as time-barred.  (Doc. 23; Doc. 56).  Those claims are not part of the plaintiff's SAC, are not part of this case, and they will not be considered.

As noted, before her promotion to corporal, plaintiff was a DO, at grade B04, step G of the TCSO Salary Scale, which resulted in a monthly salary of $2,471.  After she was promoted, plaintiff was a corporal, at grade B06, and her pay was set at the lowest step within that grade - step A - which increased her salary to $3,218 monthly.  Plaintiff alleges that the failure of the TCSO to give her a bigger raise was the result of race and/or sex discrimination.  In support of her race discrimination claim, she notes that her raise was inconsistent with TCSO's written policy regarding salary, and had that policy been applied to her promotion, plaintiff would have been placed at a higher step within the corporal grade and thus received a higher rate of pay.  For comparison purposes, plaintiff has identified other employees of the TCSO who are not African American, and she claims that they were paid more than her or received greater raises than her.

The first element of a prima facie case is undisputed here.  As an African American woman, plaintiff is a member of two protected classes.  As to the second element, defendants claim that plaintiff did not suffer an adverse employment action because she received a raise of 30%.  However, her claim is that her raise should have been significantly larger, based upon

TCSO's written policy.  That difference in pay – between what she was paid after her promotion and what she claims she should have been paid under the written policy – would be considered materially adverse by a reasonable employee.  The Court will hence deem the second prima facie element satisfied for purposes of this analysis.

With respect to the third element, plaintiff has not presented evidence that she was paid less for doing a job similar to others or that she was paid unequal pay for equal work.  Instead, plaintiff asserts that an inference of racially discriminatory intent can be inferred because some Caucasian and/or male employees were paid in accordance with TCSO's written salary policy, whereas plaintiff was not paid pursuant to that policy when she was promoted in 2009. For purposes of comparison, plaintiff has identified the following Caucasian employees who were paid in accordance with written policy when they were promoted: Carla Housley, Randy Chapman, Shane Rhames, and Robert Fleenor. (*See* Doc. 61 at 13, ¶ 32).[2]  The following chart

---

[2]     In her summary judgment response, plaintiff additionally referenced Jack Reusser, "Corporal Anderson, Tatum, and Mendenhall" as "Caucasians who were not subjected to the same pay differential to which Ms. Brown was subjected." (Doc. 61 at 13, ¶ 31).  But she has not backed up any claim of disparate pay with *evidence* (*see id.*), and she has presented nothing to counter the statements of the TCSO CFO that, upon promotion, Anderson, Tatum, and Mendenhall were placed at step one of their pay grades and each was adjusted in a manner resulting in a 10% raise (*see* Doc. 56-20 at 8, ¶ 49).  Plaintiff only asserts that plaintiff previously "stated" that those employees were treated differently, and the only evidence cited is Exhibit 10 to her response (Doc. 61-10), which provides no information about the pay received by Reusser, Anderson, Tatum, or Mendenhall (*see id.*).  In fact, Exhibit 10 makes *no mention* of Anderson, Tatum, or Mendenhall, and the only reference to Reusser is a complaint about his promotion, not disparate pay.  (*See id.*).  The Court has previously dismissed, as time-barred, plaintiff's failure to promote claims.  (*See* Doc. 23).

In her SAC (Doc. 31 at ¶ 30), plaintiff also identified Roland D'Souza as a Caucasian who was treated differently, but at her deposition, she indicated that D'Souza is *not* Caucasian and she does not know his race.  (Doc. 56-1 at 83-84).  The Court declines to use for comparison purposes an employee whose race is not established in the record.  In any event, D'Souza's promotion occurred years before plaintiff's, and he was promoted on the first day that TCSO took over the operations of the Jail in 2005.  His circumstances were thus materially different than plaintiff's.

reflects the record as to the comparator employees' pay raises when promoted, as compared to plaintiff's pay at promotion:

| Name | Race & Sex | Promotion | Grade / Step Change | Salary on Promotion | % Increase |
|------|-----------|-----------|---------------------|---------------------|------------|
| Plaintiff | African American female | DO to corporal | B04/G to B06/A | $2,471 to $3,218 | 30% |
| Housley | Caucasian female | corporal to sergeant | B06/I to B07/H | $4754 to $5,230 | 10% |
| Chapman | Caucasian male | corporal to sergeant | B06/F to B07/E | $4,107 to $4,518 | 10% |
| Rhames | Caucasian male | corporal to sergeant | B06/D to B07/C | $3,725 to $4,098 | 10% |
| Fleenor | Caucasian male | corporal to sergeant | B06/B to B07/A | $3,379 to $3,717 | 10% |

Plaintiff's evidence and arguments concerning these comparators does not support an inference of discrimination based on sex or race. This evidence does not show that plaintiff occupied a job similar to that of higher paid employees of a different sex or race or that the comparators were paid more for doing equal work. Each of the comparators was promoted from corporal to sergeant, a position above plaintiff's rank, and thus earned higher pay. Also, each comparator was promoted only one salary grade – which is the equivalent of 11 steps – whereas plaintiff was promoted two salary grades and the equivalent of 18 steps in the pay scale. The comparator employees were also "certified" law enforcement officers, whereas plaintiff was a non-certified employee limited to the Jail.[3] From any angle, plaintiff actually received a greater percentage increase in pay than any of the comparators; each comparator received only one-third of the percentage pay increase that plaintiff received. Plaintiff has simply not shown that she

_____

[3] Non-certified employees of the TCSO are limited to working at the Jail, whereas certified law enforcement employees may serve in the Jail and/or the field. Certified officers also have the power to arrest, "do police reports," and patrol the streets, while "non-certified officers can't do that." (*See* Doc. 56-1 at 20:12 to 21:18, 89:5-13).

occupied a position similar to the comparators, nor has she provided any evidence from which an inference of discriminatory intent could be inferred.

Even if these comparisons were evidence from which a jury could infer race or sex discrimination, the defendants have provided a legitimate, non-discriminatory explanation for employing a practice different from written policy with respect to plaintiff's promotion from DO to corporal.  Specifically, defendants assert that a promotion typically results in a 10% increase in pay, except where step one on the pay scale for the new position results in a pay increase greater than 10%, in which case the employee will start at the first step of the new grade / position.  (Doc. 56-20 at 492, ¶¶ 46, 48 [TCSO Chief Financial Officer indicated that "when an employee is promoted they normally receive at least 10% raise unless their adjustment to step one on the new scale is greater than 10% . . . if that promotion is high enough the employee winds up on the first step of that new scale which may be greater than 10%"]).  This explanation is consistent with what plaintiff was advised at the time she complained that the policy was not applied properly (*see* Doc. 56-4 at 1 [Haley Collins in payroll "stated that a promotion increases a person's pay by ten percent [and plaintiff received  more at step one of the new position]"]).  It is also consistent with the promotions of the previously discussed comparators, each of whom received raises of only 10% upon application of the written policy.

Defendants' assertion of the reasons for promoting plaintiff to the first step in the corporal grade is also in harmony with TCSO's practice of paying similarly-situated detention officers promoted to the position of corporal.  In fact, in her promotion from DO to corporal, plaintiff was treated the same as other TCSO employees so promoted.  For example, Michelle Ramsay, a Caucasian female, was a DO who was promoted on March 1, 2008.  At the time, her monthly pay as a DO was $2032 (grade B04 step C), and she was promoted to corporal and her

8

pay was set at $3065, the lowest step of the corporal grade (B06, step A).  (*See* Doc. 61-8 at 848-849; Doc. 65-1 [pay scale applicable at the time of Ramsay's promotion]).  Robin Strope, a Caucasian female, was promoted from DO with monthly salary of $2,241 at grade B04, step E, and she was promoted to corporal earning $3,218, which was grade B06, step A.  (Doc. 61-8 at 271; Doc. 61-9).[4]

The Strope and Ramsay examples – which are closely akin to plaintiff's situation in that (1) they were for the same promotion from DO to corporal and (2) each started at the lowest step of the corporal grade, with a raise of well over 10% – are completely consistent with defendants' proffered legitimate, non-discriminatory reason for setting plaintiff's pay upon her promotion to corporal.  Plaintiff counters that, because Ramsay and Strope received a higher percentage increase, they should not be used as examples.  (*See* Doc. 61 at 14, ¶ 33). That argument, however, in no way undermines the defendants' legitimate, non-discriminatory explanation that, in practice, employee promotions are designed to gain a 10% raise in pay and where application of the written policy would result in a raise significantly higher than that, the promoted employee will be promoted to the lowest pay step of the new position.  Thus, even assuming plaintiff had established a prima facie case, she still did not meet her burden to show that defendants' proffered reason was pretextual, because plaintiff has not shown that the defendants' explanation is implausible, weak, inconsistent, or contradictory such that a factfinder could find the explanation unworthy of credence. *See Morgan*, 108 F.3d at 1323.  Plaintiff's arguments amount

---

[4]     The record also reflects a male detention officer who was promoted to corporal in May 2009, from grade B04, step E to grade B06, step A, which is consistent with TCSO's treatment of the other detention officers who were promoted to non-certified corporal.  (*See* Doc. 61-12, entry for Oliver Karl Newton).  The record does not reflect his race, but his similar treatment in pay grade and step on promotion would be relevant to plaintiff's sex discrimination claim.

to mere conjecture of pretext, which is insufficient to defeat a motion for summary judgment. *Richmond*, 120 F.3d at 209.

Plaintiff also points to a Caucasian female, Mary Blendowski, who was *not* paid in accordance with the written salary policy, but was paid in excess of it for her position.  Ms. Blendowski was paid $43,440 per year ($3,620 monthly) while a DO.  As plaintiff's counsel emphasized during Mr. Glanz's deposition, Blendowski is married to Tulsa County Assessor Ken Yazel, is a personal friend of Glanz, and previously had a business with Glanz in 2004 and 2005.  (*See* Doc. 61-6 at 42:13-24).  Blendowski was an employee of Tulsa County when she was transferred from another Tulsa County position to TCSO on June 8, 2010, and her salary remained the same as it was in her prior position. (*See* Doc. 56-14, 56-15).  In 2011, she was reclassified as a deputy, with no increase in her pay.  (Doc. 56-16).  Defendants have identified other reasons that justified her pay, including that she is bilingual, was assigned to the Immigration and Customs Enforcement Unit, and assisted on the community side of the ICE Program, in more of a public relations position.  (Doc. 56-2 at 44:14-17).   That Blendowski, a female, was paid more, does nothing to establish any sex discrimination against the plaintiff, and plaintiff has offered no evidence that plaintiff was paid less than Blendowski, a Caucasian, on account of race.  (*See* Doc. 56-1 at 80:1-5 [plaintiff testified that she thinks the different treatment of Blendowski "has something to do with" Blendowski being Ken Yazel's wife]; *see also* Doc. 61-6 at 42:13-24).

Plaintiff has testified that, on the day she was promoted to corporal (September 1, 2009), Deputy Chief Michelle Robinette told plaintiff that, as a black woman, she would have to work harder to prove herself "in this field."  (Doc. 61-1 at 29-30).  Robinette denies that she referenced plaintiff's race, but acknowledges that she had a conversation with the plaintiff shortly after

plaintiff was promoted to corporal. Robinette explained the conversation as follows: "I don't believe I made any reference to her being African-American. I did make reference to both of us being females. And coming [from] a female's position, it – it is often sometimes harder." (Doc. 56-18 at 67:14-19). Robinette also agreed that "the industry . . . [is] a predominantly male-dominated industry as far as numbers go." (*Id.* at 67:20-25).

As noted, the Court previously dismissed, as time-barred, any Title VII claims plaintiff may have had for allegations of discrete actions before August 3, 2010, which was 300 days prior to the submission of her EEOC Intake Questionnaire and thus would be untimely. (*See* Doc. 23 at 5-6). Those claims included the 2009 failure to promote her to sergeant and Robinette's statement, which plaintiff asserted was made to explain why plaintiff was not promoted to sergeant. (*See id.* at 6; *see also* Doc. 2 at 7-8, ¶ 22). While Robinette's purported statement may be appropriately referenced as "background evidence in support of a timely claim" of discrimination in compensation, plaintiff has asserted that Robinette's alleged statement related to plaintiff's time-barred claim of failure to promote, rather than to discrimination in compensation claim. (*See id.*). Plaintiff testified that she "did sense . . . at the time" – in 2009 – that the statement involved prejudice. (*See* Doc. 56-1 at 31:6-10). By October 2, 2009, plaintiff had also complained about her pay as a corporal, but she did not file any timely discrimination charge based upon Robinette's alleged statement. Thus any claim based upon Robinette's purported reference to plaintiff's race and sex is accordingly time-barred, as the Court has previously ruled. (*See* Doc. 23 at 5-6).

Even were Robinette's statement considered as evidence of discriminatory intent connected to a timely Title VII claim, such that plaintiff had met her prima facie burden, the defendants presented compelling evidence of a legitimate, non-discriminatory reason for the

TCSO's assignment of plaintiff to the first step of the corporal pay grade, and the plaintiff's evidence does not show pretext, as discussed above.  Accordingly, summary judgment will be **granted** as to plaintiff's Title VII claims of race and sex discrimination in compensation.

### C.    Section 1983 Claims (Second and Third Claims)

In her SAC, plaintiff asserts claims for race and gender discrimination in pay in violation of 42 U.S.C. §§ 1981, 1983.  (Doc. 31 at 8-9).  In her summary judgment briefing, plaintiff characterizes her § 1983 claims as claims under the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 61 at 24).  Plaintiff's equal protection claims overlap with her Title VII race discrimination claim: "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under . . . § 1983 or Title VII."  *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005)).  Because the Court has determined that there are no genuine disputes of material fact and plaintiff has not established race or sex discrimination under Title VII, her similar claims must fail under §§ 1981 and 1983.  In short, defendants argue that, because plaintiff has not established any constitutional violation, her § 1983 claims cannot survive.  The Court agrees; plaintiff has not provided evidence of race or sex discrimination in her pay so as to establish a violation of her Equal Protection rights.

In addition, plaintiff's Equal Protection claims for municipal and individual liability do not survive summary judgment for the reasons discussed below.

### 1.    Official Capacity Claim [5]

For official capacity or municipal liability under § 1983, the plaintiff must demonstrate that the municipality's officials acted pursuant to a "custom or policy" of "discriminatory

---

[5]    Because Glanz is no longer the acting Sheriff of Tulsa County, the acting Sheriff, Vic Regalado, has been substituted for Glanz on the official capacity claim.  (*See* Doc. 86).

employment practices." *Carney*, 534 F.3d at 1273 (quoting *Randle*, 69 F.3d at 446, n. 6, 447). A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of respondeat superior. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, __ U.S. __, 131 S. Ct. 1350, 1359 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

To establish municipal liability under § 1983, a plaintiff must show "1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged." *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)). The requirement of a policy distinguishes the "acts of the *municipality* from acts of *employees* of the municipality, and thereby make[s] clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479 (emphasis in original). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.'" *Connick*, 131 S. Ct. at 1359.

The Court agrees with the defendants that there is no evidence of a TCSO policy of racial or gender discrimination in compensation. In an effort to fit her claims into the § 1983 *Monell* framework, plaintiff asserts that TCSO did not follow its written policy with respect to plaintiff because of her race and/or sex. But, as noted above, the undisputed record evidence in this case reflects that the plaintiff's pay upon promotion to corporal was set in the same manner as other

employees who were promoted from DO to corporal in the same timeframe.  Thus, there is evidence that defendant had a typical practice of promoting employees to the grade and step that would result in a 10% raise, except where the lowest step on the salary scale for the employee's new rank would result in a raise well in excess of 10%, in which case the employee would be assigned that lowest step on the new salary grade.  The comparator employees cited by plaintiff were treated in accord with that same established practice.  The exception was Ms. Blendowski, who was hired from another Tulsa County position and continued to earn her same salary upon transferring to TCSO and who plaintiff alleges was treated differently because of her relationship to Mr. Glanz, not her race or sex.  In short, plaintiff was paid consistent with other employees who did not share her race or sex.  The evidence does not support plaintiff's contention of a policy or custom of pay discrimination based on race or sex, and the Sheriff's summary judgment motion will be **granted** as to the § 1983 *Monell* claims.

## 2.    Individual Capacity Claim

Like municipal liability law under § 1983, a supervisor also may not be held liable individually under a theory of respondeat superior.  *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)).  Three elements are required to establish supervisory liability: (1) personal involvement; (2) causation; and (3) state of mind.  *Schneider*, 717 F.3d at 767.

"[Section] 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution. . . .'" *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th

14

Cir. 2010) (quoting § 1983). A plaintiff may therefore establish supervisor liability by showing that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* at 1199-1200.

For the same reasons as set forth above, plaintiff has not established such a claim against Mr. Glanz in his individual capacity. There is no evidence of a race or sex discriminatory pay policy, and the evidence is that plaintiff's pay grade and step were established consistent with the pay grades of similarly situated employees at the time of their promotions. Thus, the fact that Glanz ratified the plaintiff's beginning pay grade following her promotion to corporal does not give rise to a claim against him in his individual capacity.

Mr. Glanz has also asserted that he is entitled to qualified immunity. In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry. *Tolan*, 134 S. Ct. at 1865. The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Government officials are "shielded from liability . . . if their actions did not violate clearly established" federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope*, 536 U.S. at 739) (internal quotation marks omitted).

The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at

hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Because the Court has found that there was no violation of plaintiff's Equal Protection rights – either by Mr. Glanz or by any other employee of TCSO acting under any discriminatory policy or practice for which Glanz is responsible – Glanz is also entitled to qualified immunity.  Mr. Glanz's summary judgment motion is **granted** as to plaintiff's § 1983 claims.

> **D.** **Retaliation (Fifth Claim)**

The defendant argues that plaintiff cannot establish a Title VII retaliation claim.  Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice. . . ."  Although the statute does not refer to such discrimination as "retaliation," the courts have so named claims under § 2000e-3(a).  A plaintiff may establish retaliation by presenting direct evidence of retaliatory motivation or, in the absence of direct evidence, a plaintiff must establish a prima facie case under the *McDonnell Douglas* framework. *Conroy v. Vilsack*, 707 F.3d 1163, 1171 (10th Cir. 2013).  Plaintiff has not presented any direct evidence of retaliatory motive; the Court must hence analyze plaintiff's evidence under the burden-shifting framework of *McDonnell Douglas*.

To establish a prima facie case of retaliation, the plaintiff has the initial burden to show that (1) she engaged in protected activity, (2) she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action.  *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, (10th Cir. 2015); *see also Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).  To establish that causal connection between the protected activity and the adverse employment action, plaintiff must present evidence of circumstances that justify an inference of retaliatory motive.  *Ward v. Jewell*, 772 F.3d 1199,

1203 (10th Cir. 2014) (citation omitted).  "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection."  *Id.*  The Supreme Court construes the causation requirement as requiring a showing that the employer's desire to retaliate was the but-for cause of the challenged employment action.  *See Univ. of Texas Southwestern Med. Ctr. v. Nassar*, __ U.S. __, 133 S. Ct. 2517, 2528 (2013); *Thomas*, 803 F.3d at 516, n.8 (applying *Nassar* at the summary judgment stage).

Here, there is no dispute that plaintiff engaged in protected activities; she filed an EEOC Charge of Discrimination and this lawsuit.  That element of her prima facie case is met.

The defendant argues that the plaintiff has not provided evidence of the second and third elements of the prima facie case of retaliation, in that the actions of which plaintiff complains do not amount to materially adverse actions against her after the filing of her EEOC Charge or lawsuit and plaintiff has provided no evidence of retaliatory motivation behind those challenged actions.  With respect to determining whether an action is adverse, the Supreme Court has stated that recovery under Title VII's retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment."  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).  Rather, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," such that a reasonable worker might have been dissuaded from engaging in protected activity.  *See id.* at 68.  This is so because the retaliation aims to deter victims of discrimination from complaining to the EEOC, the courts, and their employers.  *Id.* (citation omitted).  The standard is stated "in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances."  *Id.* at 69.  In the Tenth Circuit, "adverse employment action" is liberally defined.  *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010).

In support of her retaliation claim, plaintiff asserts that, after the filing of her EEOC Charge and her lawsuit, she suffered the following, which she asserts were adverse employment actions: (1) In October 2012, Billy McKelvey was assigned as a Captain at the Jail and became a supervisor in plaintiff's chain of command, and McKelvey appointed a sergeant over plaintiff, which "essentially stripped [plaintiff] of the supervisory duties she had prior to McKelvey's arrival"; (2) "Around October 2013, [plaintiff] was followed at work and watched on cameras and then called to a meeting with Chief Robinette and Undersheriff Tim Albin wherein she was accused of not performing her job," and she "was told she had six months to improve and if she did so, she could keep her job"; (3) At a December 11, 2013 meeting, then-Undersheriff Tim Albin "referred to lawsuits against the Sheriff's Office as bullshit lawsuits in [plaintiff's] presence"; and (4) that she "suffered shift changes in October 2013 as retaliation for her complaints." (Doc. 61 at 15, ¶ 44; *id.* at 22-23 of 30).

With respect to Albin's remarks about "bullshit lawsuits," plaintiff testified that he was not referring to *her* lawsuit, and she understood that he was referring to "lawsuits in general." (Doc. 56-1 at 101:2-8).   In that context, those remarks do not amount to an action that a reasonable employee would have found to be materially adverse so as to dissuade engagement in protected activity.  Even were they considered materially adverse actions, plaintiff's admission that Albin's remarks were not directed to *her* lawsuit, but to lawsuits in general, completely eliminates any inference of an animus to retaliate against her.  Albin explained that his remarks were directed at inmate lawsuits (*see* Doc. 61-19 at 508), which is consistent with plaintiff's own admission that his remarks were not directed at her (Doc. 56-1 at 101:2-8).

A shift change can, in certain situations, be considered an adverse employment action.  In *Burlington Northern*, the Supreme Court identified situation-dependent examples of material

adversity, one of which related to a change in shift: "A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington Northern*, 548 U.S. at 69.  Although plaintiff has provided no evidence of any particular reason that the shift change would have been considered materially adverse, her burden is light at the prima facie stage, such that the Court will consider the shift change to meet the adverse action element of the prima facie case.  However, plaintiff has presented *no evidence* from which a jury could infer that the October 2013 shift change – over a year after she filed her lawsuit and more than two years after she filed her EEOC charge – was for purposes of retaliating against her.  Accordingly, plaintiff has not established a prima facie case on the shift change allegation.  Even had she done so, this claim would fail at the pretext stage, as plaintiff has presented no evidence to overcome the defendants' evidence that shift changes at the Jail are common and, during the specific time frame of which plaintiff complains, shift changes were issued to at least 12 jail employees, including the plaintiff, such that the plaintiff's shift changes were made for legitimate, non-discriminatory reasons.  (*See* Doc. 61-19 at 504).  Plaintiff's shift-change retaliation claim fails.

Plaintiff's complaint that she was watched and then told she must improve in order to keep her job could be considered an adverse employment action.  The evidence is weak and does not support plaintiff's construction of that activity, however, because she was not actually disciplined.  The evidence shows that the Jail Investigations Office (JIO) reviewed plaintiff's activity via video footage on the Jails' closed circuit television system, for the period of October 20 to 28, 2013, more than a year after she filed her lawsuit.  (*See* Doc. 61-19 at 22).  During that time, the JIO reportedly discovered that, of 45 hours on the clock, plaintiff spent 3.45 hours "outside the facility." (*See* Doc. 61-19 at 506).  Robinette testified that the on-the-job

whereabouts of plaintiff, along with other supervisors, were being investigated due to concerns over their job performances.  (Doc. 56-18 at 45:2-12, 47:7-12, 48:2-7).  Albin also stated that plaintiff was one of a group of supervisors who were not performing to the desired standard such that they were evaluated by video.  (Doc. 56-20 at 505).  Ultimately, the supervisors were not disciplined, but were told what was expected of them and that they should "get back in the game."  (*Id.*).  Plaintiff has not provided any evidence that these explanations of legitimate, non-discriminatory reasons for evaluating plaintiff's whereabouts at the Jail for eight days, more than a year after this lawsuit was filed and more than two years after the charge was submitted to the EEOC, are a pretext for retaliation, such that this claim also fails.

As to plaintiff's claim that she was "essentially stripped" of supervisory duties by Billy McKelvey's appointment of a sergeant to the midnight shift to which both McKelvey and plaintiff were assigned, the Court will assume arguendo that a change in duties could be considered an adverse employment action under *Burlington Northern*.  The crux of plaintiff's argument is that McKelvey, as the newly appointed captain on plaintiff's shift, decided to appoint a sergeant, which had the result of stripping her of supervisory duties, which she claims was retaliatory.  McKelvey disputes that he stripped plaintiff of her supervisory duties, because the practice at the jail is that a corporal is a working supervisor and has supervisory capacity when there is not a higher-ranked supervisor around.  (*See* Doc. 61-17 at 93:3-24; *see also id.* at 95:1-2 ["she was still a supervisor when I moved her under a sergeant"]; *id.* at 93:15-20).  The written policy which plaintiff herself provides on this issue supports, rather than disputes, McKelvey's assertion.  (*See* Doc. 61-23 at 3).

McKelvey also testified that, as a result of low staffing in that timeframe, there was often a shortage of female detention officers to cover the female housing units, and "that's why [he]

put a female supervisor [plaintiff] over the female unit so she could work in the female units when it was low staffing." (Doc. 61-17 at 87:14 to 90:19-24; *see also id.* at 92:2-8). In order to further explain the appointment of a sergeant over plaintiff, McKelvey testified that he "believe[s] in the chain of command and . . . rank structure, and the person that would be over [female pods] first would be the corporal versus putting a female sergeant over it," and the prior captain had that shift designed to be without a sergeant, but McKelvey did not agree with that structure, so he changed it to add a sergeant into his "span of control." (*See id.* at 92:3-13; *id.* at 92:18-25, 94:6-7). McKelvey's proffered explanations are legitimate, non-discriminatory reasons for his decision to place a sergeant over plaintiff and to place plaintiff in a direct supervisory position over the female housing pod. Plaintiff has offered no evidence from which an inference of pretext could be drawn as to this issue, and this claim of retaliation fails.

In her SAC, plaintiff also asserted that she was denied overtime pay in retaliation for participation in her lawsuit. (Doc. 61 at 11, ¶ 20; Doc. 31 at 7, ¶ 44). She has failed to support this claim with any evidence. In response to summary judgment, she merely asserts that the defendant "failed to produce records that prove [plaintiff] actually received any overtime pay and she does not believe she received time and a half pay." (Doc 61 at 11 of 30, ¶ 20). Defendant provided evidence that, between March 2011 and 2014, plaintiff earned *more* overtime hours than the other employees plaintiff identified for comparison purposes. (Doc. 56-17 at 129:14-17; *see also* Doc. 56-20 at 500). Plaintiff's response to that evidence – that defendant has not provided evidence that "Brown was given the same opportunities to earn overtime as the Caucasian comparators she listed, Rhames, Fickett, and Holloway" (Doc. 61 at 11 of 30, 20) – misplaces the burden of production; it is plaintiff's burden, initially, to provide evidence that she

was denied overtime opportunities or pay that were provided to Caucasian employees, and she has not provided any evidence whatsoever to establish that claim.

Plaintiff has presented no evidence from which any inference of retaliatory motive could be drawn.  The evidence she cites as purportedly showing retaliatory motive does not support any inference of retaliation against her in any of the challenged actions.  Although plaintiff cites testimony by Randy Chapman regarding alleged retaliation against unnamed others by Albin and McKelvey (*see* Doc. 61 at 15, ¶ 44), Chapman testified only that he had only heard "rumors" of alleged retaliation by them.  (Doc. 61-14 at 125, 175).  He further testified that he had "no knowledge about Billy McKelvey retaliating against Megan Brown" and no "direct knowledge where Albin had retaliated against employees for raising complaints."  (*Id.*).

There is no genuine dispute of material fact with respect to plaintiff's retaliation claims, and the defendant is entitled to judgment as a matter of law on plaintiff's Fifth Claim.  Summary judgment will be **granted** on those claims.

## IV.    Conclusion

For the foregoing reasons, the motion for summary judgment (Doc. 56) is **granted** in all respects.  As a result, the pending motion in limine (Doc. 55) is **moot**.  A separate Judgment will be entered.

DATED this 29th day of June, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE